**VILLAUME INDUSTRIES, INC., Appellant,**

v.

**DAKOTA COUNTY BOARD OF COMMISSIONERS, et al., Goodhue County Board of Commissioners, et al., Respondents,**

**North American Hydro, Inc., Intervenor, Respondents.**

No. C3–85–2313.

Court of Appeals of Minnesota.

May 6, 1986.

Paul W. Rogosheske, Edward Lynch, Thuet, Lynch, Pugh & Rogosheske, South St. Paul, for Villaume Industries, Inc.

Robert Carolan, Dakota Co. Atty., James C. Backstrom, Asst. Co. Atty., Hastings, for Dakota County Board of Commissioners, et al.

Gary Fridell, Goodhue Co. Atty., Red Wing, for Goodhue County Bd. of Com's., et al.

George L. May, Shawn M. Moynihan, Hertogs, Fluegel, Siegen, Polk, Jones & Laverdiere, Hastings, for North American Hydro, Inc.

Heard, considered and decided by SEDGWICK, P.J., and PARKER and FORSBERG, JJ.

## OPINION

PARKER, Judge.

Appellant Villaume Industries, in its capacity as a taxpayer, brought this action to enjoin respondents Goodhue and Dakota Counties from entering into a long-term lease for the development of a jointly owned hydropower dam. Villaume appeals from a trial court order dissolving a temporary restraining order and dismissing Villaume's complaint with prejudice. We affirm.

## FACTS

Dakota and Goodhue Counties jointly own a dam and attached powerhouse at Lake Byllesby, located on the Cannon River. The counties received an order from the Federal Energy Regulatory Commission allowing the counties to proceed to develop hydropower at Lake Byllesby Dam. The counties prepared a formal request for sealed proposals (RFP) to select a developer for the project.

The draft RFP was presented to all potential developers expressing an interest in the project, including Byllesby Hydro Power Co. (BHP). BHP is closely tied to appellant Villaume. BHP's principals are Robert Linsmayer and Peter Burno. Linsmayer is also president of Villaume Industries. The final RFP was submitted, and seven sealed proposals were received for the project, including proposals from BHP, respondent North American Hydro (NAH), and American Hydro.

A selection review committee was appointed by the Dakota and Goodhue County Boards. A subcommittee of this group recommended further consideration of the proposals of BHP, respondent NAH, and American Hydro. The full selection review committee recommended that NAH be awarded the project. BHP was the committee's second choice.

Respondents state that the committee evaluated the proposals in accordance with the criteria contained in the RFP, including (1) technical and financial experience and capability; (2) guaranteed income to the counties; (3) the reimbursement formula to the counties; (4) the level of risk to the counties; and (5) start-up dates.

The counties retained the services of independent engineering and financial consultants to aid in drafting the RFP and evaluating the proposals. Barr Engineering provided engineering input, and Peat, Marwick, Mitchell & Co. provided financial advice. The RFP stated that preference would be given to proposals that "responsibly maximize the net economic benefit to the Counties from permitting development at the site, that provide maximum system dependability, and that responsibly minimize the risks to Dakota and Goodhue Counties in connection with the development of the site * * *." Nowhere does the RFP state that revenue maximization was the sole criterion in the selection process.

RFP section V, subsection (c), entitled "Right to Reject," states:

In submitting this proposal, it is understood by the undersigned that the right is reserved by the Counties to accept any proposal, to reject any and all proposals, and to waive any irregularities or informalities that are in the best interest of the Counties.

The evaluation committee's final recommendation of NAH as the number-one-ranked developer and BHP as the number-two-ranked developer was based on comparison of the two developers' sealed pro-

posals. This comparison indicated that NAH's original proposal provided more revenue and less risk to the counties than BHP's original proposal.[1]

The Goodhue County Board approved the committee's recommendation and authorized commencement of contract negotiations with NAH in accordance with the selection procedure outlined in the RFP. The Dakota County Board unanimously passed a similar resolution despite BHP's objections. The RFP provided for a 30-day negotiation period to follow selection of the developer:

> Upon approval of the selected developer and receipt of authorization to commence negotiations, the Counties will enter into negotiations with the selected developer concerning the terms of the development agreement between the parties. If, however, the Counties and the selected developer have not executed a development agreement for the site within thirty calendar days of the date of authorization to commence negotiations, the Counties may, at their option, terminate negotiations with the selected developer and initiate negotiations with the second-ranked developer.

At the Dakota County Board meeting the board denied BHP's request to negotiate jointly with the counties along with NAH, but told BHP it could submit additional information to the county for consideration. Afterward, BHP submitted documents criticizing the NAH proposal and making counterproposals. Several meetings were held in response to BHP's continued activity.

The Dakota County Board responded to BHP's allegations that the counties' financial consultant had committed substantial errors by authorizing staff to retain Coopers and Lybrand to provide a second financial opinion. Coopers and Lybrand found no errors by Peat, Marwick, Mitchell & Co. in their analysis, as BHP alleged, and found no material factors overlooked.

During the negotiation period BHP submitted, on two occasions, substantial modifications to its original proposal. The first revision of BHP's proposal changed its reimbursement formula from 50–55 percent of income to $33\frac{1}{3}$ percent of revenue after expenses and raised its guaranteed tax payment from zero to $35,000. BHP's second revised proposal was submitted to Dakota County staff three months after receipt of the sealed proposals. This proposal again changed the basis of the reimbursement formula to the counties by converting it to a 25–36 percentage of gross revenue, rather than a $33\frac{1}{3}$ percentage of revenue after expenses. BHP argues that its proposal will return between $1,000,000 and $3,000,000 more to the counties than the NAH proposal.

NAH's original proposal was modified to address items not specifically covered in the RFP but which came to light during the course of negotiations. NAH's additional concessions included financial participation in sluice gate repairs, crest gate improvements, and compensation for income which may be lost as a result of the developer signing a long-term energy contract with NSP in 1987 rather than 1988. These additional concessions increase reimbursement to the counties by approximately $39,000 over the 50-year life of the lease.

## ISSUE

Did the trial court err in dissolving the temporary restraining order and dismissing Villaume's complaint?

---

1. Charles Lowery, Dakota County parks director and primary staff person responsible for coordinating the Byllesby hydropower project, testified by affidavit that the committee's recommendation was based on the following factors: (1) NAH proposed a substantially higher guaranteed income to the counties—$55,000 as compared to $23,400; (2) NAH's reimbursement formula to the counties was based on a percentage of *gross revenues*, while BHP's was based on a percentage of *net income*; (3) NAH had a 13-month shorter time period for completion of the project; (4) NAH's proposal contained reference to guaranteed annual property tax payments, while BHP's proposal did not; and (5) NAH's reconstruction cost projection was viewed as more realistic by the counties' engineering consultant.

## DISCUSSION

This appeal is taken from a trial court order granting respondents' motion to dismiss for failure to state a claim. Nevertheless, it is clear that the trial court reached the merits of Villaume's claim for injunctive relief when it dismissed the company's complaint with prejudice.[2] For purposes of this appeal, we treat the trial court's order as a denial of injunctive relief.

■ The trial court found that Minn. Stat. § 105.482, subds. 8, 9 (1984), gives the counties broad discretionary power in the leasing of dams for the development of hydropower, and in the absence of fraud or gross abuse of discretion, the courts must accede to the exercise of that discretion by the legislative authority. We agree.

Minn.Stat. § 105.482, subd. 8, provides in pertinent part:

Consistent with laws relating to dam construction, reconstruction, repair, and maintenance, the legislature finds that the public health, safety, and welfare of the state is also promoted by the use of state waters to produce hydroelectric * * power. Further the *legislature finds that the leasing of existing dams * * * primarily for such power generation is a valid public purpose.* A local governmental unit * * * may provide pursuant to a lease or development agreement for the development and operation of dams * * * and hydroelectric * * * power generation plants owned by the respective government by an individual, a corporation, an organization, or other legal entity *upon such terms and conditions as the local governmental unit * * * may negotiate* for a period not to exceed 99 years.

*Id.* (emphasis added). Subdivision 9 goes on to provide:

An agreement for the development or redevelopment of a hydropower site *may*

contain, but need not be limited to, the following provisions:

(a) Length of the development agreement, *subject to negotiations between the parties* but not more than 99 years, and conditions for extension, modification, or termination * * *.

Minn.Stat. § 105.482, subd. 9 (emphasis added).

■ Although the hydropower statute expressly authorizes the counties to *negotiate* hydropower lease and development agreements, Villaume argues that they were obligated to follow strict competitive bidding procedures under the general statutory provision granting counties the authority to lease real property. Villaume's reliance on Minn.Stat. § 373.01, subd. 1(4) (1984), is misplaced.

Section 105.482 supersedes § 373.01 and gives the counties the authority to negotiate hydropower leases without recourse to competitive bidding procedures. Section 105.482 deals with the specific issue of hydropower development and was passed after the relevant sections of § 373.01. Furthermore, the supreme court has consistently construed public bidding provisions very narrowly. "This principle of narrow construction requires that the contract being challenged must unambiguously fall within the language of the public bidding statute." *Hubbard Broadcasting, Inc. v. Metropolitan Sports Facilities Commission,* 381 N.W.2d 842, 847 (Minn. 1986).

The record supports the trial court's dismissal of Villaume's request for injunctive relief. In *Dahlberg Brothers, Inc. v. Ford Motor Co.,* 272 Minn. 264, 137 N.W.2d 314 (1965), the supreme court specified five factors to be considered in granting or denying a temporary injunction:

(1) The nature and background of the relationship between the parties preexist-

---

2. The record shows that neither the parties nor the trial court approached the matter as a motion for judgment on the pleadings. *See* Minn. R.Civ.P. 12.03. The parties submitted affidavits and exhibits and argued the merits at the hearing on the motion. Under rule 12.03, if matters outside the pleadings are presented to the court, the motion shall be treated as one for summary judgment. The trial court's memorandum of law indicates that Villaume's complaint was considered and dismissed on the merits.

ing the dispute giving rise to the request for relief.

(2) The harm to be suffered by plaintiff if the temporary restraint is denied as compared to that inflicted on defendant if the injunction issues pending trial.

(3) The likelihood that one party or the other will prevail on the merits when the fact situation is viewed in light of established precedents fixing the limits of equitable relief.

(4) The aspects of the fact situation, if any, which permit or require consideration of public policy expressed in the statutes, State and Federal.

(5) The administrative burdens involved in judicial supervision and enforcement of the temporary decree.

*Id.* at 274–75, 137 N.W.2d at 321–22 (footnotes omitted).

■ The trial court articulated two principal reasons for dismissing Villaume's complaint. The first was the broad discretionary authority vested in the counties under § 105.482, subd. 8, to select and negotiate with hydropower developers. The statutory purpose of promoting hydropower development would be substantially undercut by limiting the counties' discretion to negotiate with developers. The second reason cited by the trial court was the absence of any showing of fraud or gross abuse of discretion by the counties in awarding the development contract to NAH. *See Borgelt v. City of Minneapolis,* 271 Minn. 249, 135 N.W.2d 438 (1965). The record shows that the counties followed the RFP selection process that had been approved by all the interested developers, including BHP.

The record also supports the counties' decision to select NAH over BHP based on the developers' original sealed proposals. Nevertheless, the counties made every effort, including hiring a second independent financial consultant, to review BHP's claim that its proposal was superior.

BHP's claim that its proposal would vastly increase revenues over the NAH proposal is based on revised proposals that were submitted after the original sealed propos-

als. As stated above, BHP's revised proposals contained substantial and material changes from their original proposal. BHP's attempt to turn the selection process into an auction would have violated the terms of the RFP and introduced a potential for abuse that public contract-letting procedures are meant to preclude. *See Griswold v. County of Ramsey,* 242 Minn. 529, 65 N.W.2d 647 (Minn.1954).

## DECISION

The counties did not abuse their discretion in selecting NAH to develop the Byllesby dam. Villaume could not have prevailed on the merits in light of established precedents fixing the limits of equitable relief. Accordingly, the order of the trial court dismissing Villaume's complaint with prejudice is affirmed.

Affirmed.